ARKANSAS:


IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION


JEFFREY MUSSELMAN,

        PLAINTIFF,

VS                                CASE NO. 4:22-CV-1216-BRW

CHRISTINE WORMUTH, SECRETARY,
DEPARTMENT OF THE ARMY,

        DEFENDANT.

_____


                              DEPOSITION OF
                     JEFFREY SCOTT MUSSELMAN

                     TUESDAY, NOVEMBER 21, 2023
                                  9:20 A.M.

                UNITED STATES ATTORNEY'S OFFICE
                    425 WEST CAPITAL AVENUE
                                SUITE 500
                   LITTLE ROCK, ARKANSAS 72201

TOLL-FREE 800.262.8777  LOCAL 540.667.0600  FAX 540.667.6562

County COURT REPORTERS, Inc.
Videography Litigation Technology™

DEFENDANT'S
EXHIBIT
2
PENGAD 800-631-6989

```
 1                    APPEARANCES:

 2  ON BEHALF OF THE PLAINTIFF,

 3  JEFFREY MUSSELMAN:

 4  JEFFREY MUSSELMAN, PRO SE

 5  22 CEMETERY ROAD

 6  VILONIA, ARKANSAS 72173

 7  E-MAIL: JEFFMUSS@ICLOUD.COM

 8

 9  ON BEHALF OF THE DEFENDANT,

10  CHRISTINE WORMUTH, SECRETARY, DEPARTMENT OF THE ARMY:

11  RICHARD M. PENCE, JR, ASSISTANT UNITED STATES ATTORNEY

12  UNITED STATES DEPARTMENT OF JUSTICE

13  UNITED STATES ATTORNEY'S OFFICE

14  425 WEST CAPITAL AVENUE

15  SUITE 500

16  LITTLE ROCK, ARKANSAS 72201

17  TELEPHONE: 501.340.2600

18  FACSIMILE: 501.340.2728

19  E-MAIL: RICHARD.PENCE@USDOJ.GOV

20

21

22

23

24

25
```

```
 1                    APPEARANCES:

 2   ON BEHALF OF THE DEFENDANT,

 3   CHRISTINE WORMUTH, SECRETARY, DEPARTMENT OF THE ARMY:

 4   MICHAEL P. DEEDS, ESQUIRE

 5   DEPARTMENT OF THE ARMY

 6   10205 BURBECK ROAD

 7   FORT BELVOIR, VIRGINIA 22060

 8   TELEPHONE: 703.693.1038

 9   E-MAIL: MICHAEL.P.DEEDS.CIV@ARMY.MIL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      Q.   Oh, Little Rock Airport.  I'm sorry.

2      A.   Yeah.

3      Q.   Okay, but you weren't selected for that job

4 I take it?

5      A.   No.

6      Q.   Okay.  All right.  Now, you, you retired

7 from your job with the, at the Pine Bluff Arsenal, I

8 believe in 2015, is that correct?

9      A.   Yes.

10     Q.   Do you remember the month?

11     A.   Yes.

12     Q.   What was it?

13     A.   I believe it was October, November.  It was

14 real, October, November timeframe.

15     Q.   Okay.  What was your, if you can remember,

16 your last day on the job?

17     A.   I don't remember.  I don't remember what it

18 was.  I just remember getting the call and saying that

19 my medical retirement had been approved and I cleaned

20 my desk out.

21     Q.   All right.  Was this some type of disability

22 retirement?

23     A.   Yes.

24     Q.   What was your disability?

25     A.   Stress.  I was taking a, a medication that

1  was incompatible with my, with my duties.  So, as a

2  technician or as an explosive ordinance removal

3  supervisor down there, the job description required

4  you to be in a personal reliability program and there

5  were certain medications on that, on their list that

6  you weren't allowed to take.  And so, when I started

7  receiving treatment for that, I notified everybody

8  that I needed to and I applied for retirement.

9      Q.    Did you have a medical diagnoses?

10     A.    Mm-hmm.   (Indicating affirmatively.)

11     Q.    What was it?

12     A.    PTSD and just stress.

13     Q.    PTSD.

14     A.    Yeah.

15     Q.    Okay.  When did you, what, when did you

16  first get the medical diagnoses?

17     A.    Well, I've had it for, let's see, probably,

18  I think it was 2013, 2014.  I got the letters in the

19  ROI, so, from the doctor.

20     Q.    Okay.  The first time you were diagnosed was

21  by an Army physician or a private physician?

22     A.    It was at the Veterans Hospital here.

23     Q.    Okay.  Then it would be ...

24     A.    They worked for the VA, but I'm not sure if

25  it was an Army or a, I took that diagnoses back to an

1  Army doctor and showed it to them.

2      Q.    Okay, and that was in what year?

3      A.    2013, 2014, thereabouts.

4      Q.    Okay.  Are you still receiving treatment for

5  that condition?

6      A.    Yes.

7      Q.    Who is your treating physician?

8      A.    The VA.  I mean, it changes, but the VA

9  right here in Little Rock.

10     Q.    VA hospital in Little Rock?

11     A.    Yes.

12     Q.    Okay.  Now, I take it your job involved not

13  only work at the Pine Bluff Arsenal, but also other

14  locations?

15     A.    Yes.

16     Q.    Okay.  At some point in time, before you

17  retired, Mr. Musselman, were you considered

18  nondeployable outside the Pine Bluff Arsenal?

19     A.    I don't know.  I don't know.  I've heard,

20  I've heard different comments, but in my opinion, I

21  wasn't, so.

22     Q.    I'm sorry; I didn't ...

23     A.    I said I've heard different comments, but in

24  my opinion, I was not, no.

25     Q.    You were not.

1    A.   No.

2    Q.   Okay.  Well, what, did the Army make a

3  determination that, although you may not have agreed

4  with it, did the Army make a determination that you

5  were nondeployable before you retired?

6    A.   Yes.

7    Q.   Okay, and when did that happen?

8    A.   Like I said, about 2013, 2014, sometime like

9  that.

10   Q.   And the nondeployable determination, that

11 was based on your medical condition?

12   A.   Yes.

13   Q.   Your PTSD?

14   A.   Yes.

15   Q.   Okay.  What was the, speaking of the PTSD,

16 is there any one incident or series of incidents that

17 caused the stress?

18   A.   Well, I mean, it's a latent thing.  I was

19 hired even though this happened, but I had my arm

20 blown off in Saudi Arabia or nearly blown off and they

21 had to reattach my arm by sewing it to my abdomen.

22 And I was in traction or in body cast for about three

23 months.  And so, you know, the doc probably said that

24 probably started from that.  Saw a lot of dead bodies.

25   Q.   When did that happen?

1      A.    Throughout my career.  I mean, that's

2   typically what an Airforce bomb disposal technician

3   does is pick up aircraft wreckage.

4      Q.    No, I mean, when you injured your arm.

5      A.    Desert Storm.  So, it would've been March of

6   '91.

7      Q.    Okay.

8      A.    March of '91.

9      Q.    So, you were in the Airforce at the time?

10     A.    Mm-hmm.  (Indicating affirmatively.)

11     Q.    Is that correct?

12     A.    Mm-hmm.  (Indicating affirmatively.)

13     Q.    You need to say yes or no.

14     A.    I'm sorry.

15     Q.    That's all right.

16     A.    I'm sorry.  Yes, I was in the Airforce at

17   the time.

18     Q.    All right.  Are you receiving VA disability

19   benefits?

20     A.    Yes.

21     Q.    Okay, based on the PTSD diagnosis?

22     A.    Yes.

23     Q.    How long have you been receiving those

24   benefits?

25     A.    Since probably 2013, 2014, something like

1  that.  I don't know exactly, because I got, for the,

2  for the PTSD, I'm sorry.  For the PTSD, I don't know

3  that I started receiving anything for that until after

4  I'd say, yeah, the 2013, because you've got to go back

5  in and you've got a file.  And so, up until that

6  point, I was just receiving disability for my injury

7  and so, they upgraded there around that 2013, 2014

8  timeframe.

9      Q.    **Upgraded it you said?**

10     A.    Upgraded it to add that disability ...

11     Q.    **Okay.**

12     A.    ... to it.

13     Q.    **All right.  Now, I need to ask you, Mr.**

14 **Musselman, about the lawsuit that you filed here in**

15 **this case that we're here about.  I'm going to give**

16 **you a copy of your complaint.  It's Defendant's**

17 **Exhibit-1.**

18 **(WHEREUPON, the Deponent examined the document**

19 **previously marked Exhibit-1 for identification.)**

20     A.    Right.

21     Q.    **And this was filed December 8, 2022, case**

22 **number 4:22-CV-1216.  I want to direct your attention**

23 **to paragraph eight.  It's on the second page of your**

24 **complaint.**

25     A.    Okay.

1    Q.    You're, you allege in paragraph eight, that

2    the defendant, that would be the Department of the

3    Army, because of reprisal for your being a witness to

4    prior EEO activity, EEO is equal employment

5    opportunity, is that correct?

6    A.    Mm-hmm.  Yes.  Sorry.

7    Q.    All right.  You're alleging, if I'm reading

8    this correctly, that because of the reprisal for your

9    being a witness in prior EEO activity, two things

10   happened.  You were denied administrative leave and

11   secondly, you were given a low grade on an evaluation,

12   am I reading that correctly?

13   A.    Yes.

14   Q.    Check me out.

15   A.    Yes.

16   Q.    Okay, and then, you go on, on the next page

17   to give some circumstances.  You say you gave witness

18   testimony against senior management officials

19   following the workplace sexual assault of an agency

20   employee.

21   A.    Yes.

22   Q.    And then, you allege that the Department of

23   the Army retaliated against you because of that by

24   denying you administrative leave and by giving you a

25   low grade on a senior system civilian evaluation



1  report?

2      A.   Yes.

3      Q.   That is what you're complaining about, is

4  that correct?

5      A.   Yes.  Yes.

6      Q.   Okay.  All right.  Let's, I need to get some

7  details from you, Mr. Musselman.  This workplace

8  sexual assault of an agency employee that you referred

9  to in your complaint, is that, was that employee Mandy

10 Moore?

11     A.   Yes.

12     Q.   Okay.  What was her position at the arsenal

13 at that, when this sexual assault occurred?

14     A.   She was the administrative assistant for our

15 program manager.

16     Q.   Okay.  Was she a federal employee or a

17 contractor?

18     A.   Federal employee.

19     Q.   Okay, and tell me what happened here.  What

20 did this Mandy Moore complain about?

21     A.   She reported to me that she was being

22 sexually harassed.

23     Q.   By who?

24     A.   By Robert Broach, Sr.

25     Q.   Who was he ...

1      A.    Robert Broach, Sr. was our equipment

2  maintenance person.

3      Q.    Okay.  Was he in your unit?

4      A.    He was in our unit.

5      Q.    Okay.  Go ahead.

6      A.    She complained, I investigated, I pulled

7  Robert off to the side, he admitted what he was doing.

8  She'd already told me some of the stuff he had said.

9  So, I investigated.  I found all of the evidence that

10  she had referred to.  He was keeping a desk calendar

11  with her, the arrangement of her shirt and body, upper

12  torso every day.  If she had her shirt arranged a

13  certain way, he would use the same symbols and mark

14  that down.

15      He'd make crude and lewd comments to her

16  where nobody, nobody could hear about turning the air

17  conditioner down so that he could get some headlights

18  on, was the comment.

19      Q.    All right.

20      A.    He, and he also did this behavior in front

21  of other employees, other female employees in the

22  section.  They verified it.  So, I removed him from

23  that area.  I didn't, I removed him, I referred her to

24  EEO, and I reported it to the program manager Marvin

25  Hubanks.

1    Q.    All right.  When did this sexual harassment
2 occur, according to Ms. Moore?
3    A.    Roughly in the spring, summer of 2010.
4    Q.    All right.  All right, and then, did Ms.
5 Moore, at that point, did she file an EEO complaint or
6 did that come later?
7    A.    At that time, she did not file an EEO
8 complaint.
9    Q.    Okay.
10    A.    She asked that the, that I speak to Mr.
11 Hubanks and tell him what the problem was and when I
12 did, he, he wanted to be the arbiter, I guess, is the,
13 for lack of a better term and I advised him not to do
14 that.  Advised him to let the EEO process work, but he
15 said that he was going to get them all in a room and
16 hash it out, and, but then he never did that.  He just
17 let it go.
18    Q.    All right.
19    A.    He never did anything about it.
20    Q.    All right.  Did the employee Mandy Moore,
21 did she later claim that she was a victim of a sexual
22 assault?
23    A.    Yes.
24    Q.    Okay.  Did that occur in the same year, 2010
25 or the following year?

1          A.    No, it occurred, like, the early or late, in

2   early 2011.

3          Q.    All right.

4          A.    Is the best of my recollection.

5          Q.    **What did she, did she report this to you?**

6          A.    Yes.

7          Q.    **And what did she say had occurred?**

8          A.    She said that while she was at the copier,

9   she was shuffling papers, she turned around to a desk,

10  the copier, there was minimal space between the copier

11  and her, the back of her.  As she was bent over, while

12  she was bent over, Broach, Sr., Robert Broach, Sr.

13  walked between her and the copier, had a screwdriver,

14  I believe, in her hand, in his hand, and touched her,

15  probed her, or whatever with the screwdriver, on her,

16  on her rearend and made a comment to her about, you

17  know, better move over or better move.  Anyway, it

18  was, she took it as an, she took it that away and she

19  reported it and I wasn't the only one that she

20  reported it to, so.

21          Q.    All right.  Did Ms. Moore file an EEO

22  complaint in 2011?

23          A.    I don't know.  I don't think so.

24          Q.    Okay.  Well, how was that matter resolved or

25  was it resolved?

1      A.    After that happened, I went around Mr.

2   Hubanks and reported it to his boss.

3      Q.    And who would that have been?

4      A.    In Maryland.  His boss would have been,

5   well, his boss, his office, his boss would have been

6   Colonel Aswata, who was the deputy and there was a,

7   the director, a GS14 was Ms., doggonit.  I'll remember

8   the name here in a second.  But, sorry.  But anyway.

9   They worked for the director and I sent an email to

10  him telling him what was happening and that I referred

11  her to EEO.

12     Q.    Okay.  So, that occurred, you reported that

13  up the ...

14     A.    Up the chain.

15     Q.    ... chain of command in 2011?

16     A.    Right.

17     Q.    That would have been you say in the spring

18  of 2011?

19     A.    Spring of 2011.  Yes.

20     Q.    All right.  Okay.  Now, your first-level

21  supervisor at that time was Mr. Marvin Eubanks?

22     A.    Yes.

23     Q.    Hubanks.

24     A.    Hubanks.  Not Eubanks, but Hubanks.

25     Q.    I believe that's spelled H-U-B-A-N-K-S, is

1  without a couple levels up approval.  So, I know at

2  least the colonels on the staff or the general was

3  involved in that.

4          But yeah, the EEO complaint, I had to wait.

5  EEO told me that I had to wait until they denied me

6  something.  And that was the leave and the low

7  evaluation based on no, on no, well, essentially, they

8  violated their own policy.  I was not, none of those

9  guys were my supervisor.  I had never had an initial

10  interview.  Nobody had ever explained their, their

11  policies or the normal back and forth that a

12  supervisor and subordinate have when they start a

13  rating period, never happened.

14     Q.   No, I, well, who were the raters on your

15  evaluation report that you're complaining about?

16     A.   I believe Dalys Talley was the deputy

17  director at the time.  Again, they changed.  Dalys

18  Talley and a Chris Chesney was the, was the, I believe

19  he was the senior rater on ...

20     Q.   Okay.  Now, your first-level supervisor,

21  that Mr. Marvin Hubanks, Hubanks.

22     A.   Yeah.

23     Q.   He had retired in May of 2013, is that

24  correct?

25     A.   Mm-hmm.  Yes.  I'm sorry.

```
 1      Q.    And so, at the time of the evaluation that
 2  you're complaining about, you, as I understand it, you
 3  really didn't have a first-level supervisor, is that
 4  correct?
 5      A.    Yes.   That was kind of the gorilla in the
 6  room, so to speak, because I had informed on Mr.
 7  Hubanks and I wasn't going to accept an evaluation
 8  from him after that.  And he never tried to do an
 9  evaluation on me.  He was kind of, I think he didn't
10  want to, I don't know.  I don't want to presume what
11  he did.  But I never got an evaluation from him after
12  I informed on him in, I think I got an evaluation in
13  2011, but it had already been written, I think that.
14          But 2012, I never received an evaluation.
15  In 2013, he retired and they didn't do an evaluation
16  and they never did a change of rater on me either.
17  So, and then, of course, after they removed me,
18  everything was adversarial at that point.
19      Q.    All right.  This Dalys Talley, and that's an
20  unusual spelling of Dalys, is ...
21      A.    Yes, it is.
22      Q.    D-A-L-Y-S.
23      A.    Yes.
24      Q.    Talley spelled T-A-L-L-E-Y, correct?
25      A.    I believe so.
```

1    Q.    Okay.  Mr. Dalys Talley was the acting CARA

2  director for part of 2013, was he not?

3    A.    Yes.

4    Q.    And that would be what, from roughly January

5  to July?

6    A.    Yes.

7    Q.    And then, Chris Chesney became the director

8  of CARA, that's your unit, correct?

9    A.    Yes.

10    Q.    In July of 2013?

11    A.    Yes.

12    Q.    All right.  So, those were the two men that

13  were involved in the rating your complaining about?

14    A.    Yes.

15    Q.    Okay.  Do you have any evidence, Mr.

16  Musselman, that Dalys Talley in June of 2014, was

17  aware you had reported a sexual assault in 2011?

18    A.    Yes.

19    Q.    What is that evidence?

20    A.    I mean, he worked in the, he worked at our

21  headquarters.  He was in our, what we called our

22  operations center and, again, because of his position,

23  he was like the third, third ranking or third person

24  in our organization and sometimes slipped into the

25  second-place position and the first-place position

1  the office, he gave me a letter of reprimand for

2  something I never even talked to him about.  So, I

3  know that he knew, he probably was well aware what was

4  going on and that's why they picked him, so.

5      **Q.    Okay.  Do you have any witnesses or**

6  **documents that would prove that?**

7      A.    I think Mr. Neil, when he testified later in

8  2017, I think he corroborated that.

9      **Q.    Testified in what proceeding?**

10     A.    In the merit system protection board

11  meeting.

12     **Q.    All right.  Okay.  Now, we've talked about**

13  **the sexual assault that was reported by employee Mandy**

14  **Moore, 2011, that you, and you reported that.  She**

15  **reported it to you and you reported it.**

16     A.    Mm-hmm.  (Indicating affirmatively.)

17     **Q.    Are there, did you participate in any other**

18  **EEO matters other than that one?**

19     A.    Yes.

20     **Q.    Identify those for me please.**

21     A.    Well, as you can imagine, since they didn't

22  remove Mr. Hubanks, the living conditions in our unit

23  were uncomfortable and they came to the unit and

24  instead of removing him, they gave him a letter of

25  reprimand that was, really wasn't even talked about.

1  And then, we all had to go to an EEO training class

2  and Mr. Hubanks was the, I guess, guess speaker, and

3  then he admonished all of us and said that things

4  weren't going to be the same.  That he wasn't going to

5  cut anybody any slack and that anybody that committed

6  a minor offense that he had let go in the past, that

7  that wasn't going to happen again.

8           And then, about two weeks later, there was a

9  meeting, a budget meeting at the end of the year,

10 about October.  It was in September of 2013, and our

11 supply technician, who is also our, our supply

12 technician who is also our budget technician, she's an

13 African American lady.  She sat in on the, on the

14 budget meeting and Mr. Hubanks became upset and

15 started cussing out the, the Colonel Aswata, the guy

16 that had come down and done the inspection and who was

17 now the director of CARA, and he proceeded to act in

18 an unprofessional manner on a video teleconference in

19 front of a lot of the CARA staff and Ms. Carr, our

20 African American supply technician.

21           And Ms. Carr became, she was upset about it.

22 She was like, he would have never done that to Ms.

23 Jensen and he thought that it was because Colonel

24 Aswata, who was from Africa, I mean, he was from

25 Kenya, I think, and he kind of a, that he, in her

1  opinion, he insulted her.  So, she filed a complaint.

2  She told me about it and, of course, I was a witness,

3  so.

4      Q.    **When did this, what year are we talking**

5  **about here?**

6      A.    This is 2013.

7      Q.    **2013.**

8      A.    So, about two weeks later, again, leaving

9  Mr. Hubanks in the unit with a, what we call a round

10  file admonishment, the letter of reprimand, was a very

11  uncomfortable situation.  So, about two weeks later,

12  we were on a teleconference with Colonel Aswata and

13  Mr. Hubanks pretty much the same setup that y'all have

14  here.  We had video and an audio hookup and Mr.

15  Hubanks and we had probably a 50-50 mix of Caucasian,

16  mixed, mixed ethnicity folks, and about 50% African

17  American.

18          And Mr. Hubanks proceeded to mute the sound

19  and make disparaging remarks about Colonel Aswata,

20  probably because he was mad at him for giving him a

21  letter of reprimand, but I'm just guessing, and for

22  putting him through all this mess.  So, he, he insults

23  Colonel Aswata and makes fun of his, his accent,

24  because he's heavily Kenyan accent, and one of Mr.

25  Broach sexual assault person stands up in this meeting

1  and goes, I can't understand a thing he's saying.  It

2  sounds like voodoo to me.

3         And then his son, who was also one of our,

4  our employees, stood up and said something to the

5  effect of I can't understand a word he's saying.  It

6  sounds like Swahili to me, and he walks out of the

7  room.  And so, I'm pretty much, I can't believe what

8  has been said.  I'm waiting for half of this group to

9  come over to me and complain about it.  And not very

10 many of them did.  Some of them did, but, again, Ms.

11 Carr said, that's it.  He did this stuff in the budget

12 meeting and now he's doing this.  I'm filing a

13 complaint.  So, she filed a complaint on that.

14    Q.    In 2013?

15    A.    In 2013, in, like, September, October of

16 2013.

17    Q.    And so, both of these cases were running or,

18 and there was a EEO hearing in 2014, I think.  I'm

19 trying to guess.  By the time she filed them, it took

20 about six months for the investigation.  So, I was a

21 hearing, I was a witness in that and I testified to

22 what I heard, not about any of the EEO or the other

23 stuff, just what I heard in the class or in the

24 teleconference.  And ...

25    Q.    Testified at a what?



1          A.    EEO factfinding.

2          Q.    Factfinding conference?

3                +    A.    Mm-hmm.    (Indicating

4    affirmatively.)

5          Q.    Okay.

6          A.    Yes.

7          Q.    And that, you did that in 2013?

8          A.    2014, I believe.

9          Q.    Are you sure about that, Mr. Musselman?

10         A.    I believe so.  I believe so.

11         Q.    2014?

12         A.    Yeah, the, yeah.

13         Q.    Okay.  All right.  Hold that thought.

14         A.    Because it takes about six months for all

15    that stuff to roll around, so.

16         Q.    Okay.  I'm going to hand you what I've

17    marked as Exhibit-9.

18    (WHEREUPON, the Deponent examined the document

19    previously marked Exhibit-9 for identification.)

20         A.    Let's see.

21         Q.    Now, we're talking about employee Carr, C-A-

22    R-R.  Now, Exhibit-9 ...

23         A.    Yeah, you're right.  Yeah, you're right.

24    So, he would have gotten ...

25         Q.    Now, wait a minute.  I need to explain for

1  the record what we're looking at.

2       A.   Right.

3       Q.   If you give me a minute.

4       A.   Right.

5       Q.   Exhibit-9 is a list of what you're ...

6       A.   Right.

7       Q.   ... calling protected activities that you've

8  supplied to the investigator in your EEO complaint,

9  Mr. Steven Turner.

10      A.   Right.  Right.

11      Q.   You listed 11 incidents and number four is

12 Carr EEO 2011 to 2013.

13      A.   Right.

14      Q.   Okay, and that would be Jodie Carr?

15      A.   Jodie Carr.

16      Q.   J-O-D-I-E?

17      A.   Right.

18      Q.   So, she filed an EEO complaint according to

19 this exhibit in 2011 and I, and my understanding is

20 that eventually it was settled in 2013, is that

21 correct?

22      A.   I don't know.  I mean, I saw some stuff.  I

23 don't know what, what the particulars of her case

24 were.  I just knew that I got, I was drawn into it.

25      Q.   Okay.  You were, you gave a statement to a

1  factfinding investigator as to what you observed and

2  heard at ...

3      A.   Right.

4      Q.   ... that teleconference?

5      A.   Right.

6      Q.   Okay, and is that your own ...

7      A.   After.  After the teleconference.

8      Q.   After the teleconference.

9      A.   I did not participate in the teleconference.

10 I only had Ms. Carr explain it to me.

11     Q.   Okay.  You weren't there?

12     A.   Huh-uh.  (Indicating negatively.)

13     Q.   You were not?

14     A.   No.

15     Q.   So ...

16     A.   At which teleconference?  There were two,

17 the budget teleconference was just Ms. Hubanks, or Mr.

18 Hubanks and Ms. Carr and the whole, and the staff from

19 CARA and whatever other outlying areas.  That was the

20 first one that she filed.  The second one was this

21 teleconference where, where he was, what being rude or

22 disrespectful to Aswata in front of our unit, and that

23 one happened in the fall of 2013, and, again, the EEO

24 factfinding hearings from those, I believe, happened

25 about six months later after she filed those.  So, I'm

```
 1  thinking it was mid-2014.
 2      Q.   Well ...
 3      A.   I'm sorry.  I'm sorry.  2011, yeah, mid-
 4  2012.  I've got, I'm off by two years.  They came down
 5  in 2011, did the investigation.  That fall or that,
 6  that, or that, in September, they had the budget
 7  meeting in 2011.  That's when the, the whole thing
 8  with the rest of the staff happened.  And then, in,
 9  like, October of November of 2011, she, or we had the
10  EEO, or we had the staff meeting where he insulted
11  Colonel Aswata and she filed a complaint on that.  So,
12  it would've been about mid-2012, I'm thinking, is when
13  the EEO factfinding hearing for that happened.
14      Q.   Okay.
15      A.   And so, again, all that stuff was, had
16  already been ...
17      Q.   All right.
18      A.   ... water under the bridge.
19      Q.   So, to summarize it, there was an employee
20  in your unit by the name of Jodie Carter ...
21      A.   Carr.
22      Q.   ... a black female, Carr.  I'm sorry.  Carr.
23  Black female.  She made an EEO complaint complaining
24  about racial discrimination.
25      A.   Right.
```

1      Q.   Correct.

2      A.   Yes.

3      Q.   And then, 2012, you gave a statement to an

4   EEO factfinder?

5      A.   Right.

6      Q.   Okay.

7      A.   Yes.

8      Q.   Is that your ...

9      A.   That's my ...

10      Q.   ... involvement?  Is that your involvement

11   ...

12      A.   Yes.

13      Q.   ... in Ms. Carr's EEO case?

14      A.   Yes.

15      Q.   Okay.  All right.  Now, we've talked about

16   the Mandy Moore case and the Jodie Carr case.  Are

17   there any other EEO cases in which you participated?

18      A.   I mean, I'd have to get my memory refreshed,

19   but I don't think so.  Jodie's was kind of a special

20   thing because I think one other, one other element of

21   her complaint and that's one of the reasons why I was

22   involved, was because Mr. Hubanks sometime in early

23   2000s, had negotiated with Ms. Jensen to upgrade Ms.

24   Carr's position.

25           She was, like, GS3 or five, fairly low.  And

1  they upgraded it to a higher grade, GS5 or 7.  And Ms.

2  Carr was never told that and wasn't told that she had

3  the opportunity to at least figure out what she needed

4  to do to get to that higher grade.  And she didn't

5  find that out until, like I said, 2012, 2011, 2012,

6  and I think that was part of her complaint also was

7  that she factored that into her complaint.

8      Q.    **This Ms. Jodie Carr, was she under your**

9  **supervision or someone else?**

10     A.    She as not my, we had kind of a unique

11 arrangement there.  Mr. Hubanks had me rate everyone

12 on the staff.  So, I did Ms. Moore.  I did, there was

13 a budget person outright, Ms. Mann.  There had been

14 one there previous to her and she was one of the ones

15 that had complained about Robert Broach and the whole

16 air conditioner, thermostat, and looking at their body

17 parts, and other stuff.

18          So, and I also rated, at one time, we had a

19 lab, a lab supervisor, basically, anybody that Mr.

20 Hubanks didn't want to rate, I wrote, I rated.  And

21 then, he rated us, but most of the time, we rated our

22 own evaluations.

23     Q.    **Okay.  Well, what I was interested in is**

24 **were you involved in this promotion she didn't get?**

25 **Was she blaming you?**

1     A.    No, she actually was, I mean, I unknowingly

2   took the sheet that had described her position and all

3   of the, and the position description that she was

4   working under and I just kind of gave her the facts.

5   I didn't, I printed it out and gave it to her and she

6   started asking questions about the position, because

7   she wasn't a GS7 or whatever it was, GS5.  She was a

8   three and she was like, why does it say I'm a three.

9     Q.    You were not the person she was complaining

10  about?

11    A.    No.

12    Q.    Okay.  That's what I needed to know.

13    A.    I'm sorry.

14    Q.    All right.  Okay.  Let's look at Exhibit-2.

15  This is your formal EEO complaint you filed with the

16  Department of the Army.

17  (WHEREUPON, the Deponent examined the document

18  previously marked Exhibit-2 for identification.)

19    A.    Right.

20    Q.    Now, is this the only EEO complaint that you

21  filed with the Department of the Army?

22    A.    Yes.

23    Q.    Okay.  Now, in paragraph nine, you identify

24  the dates of the reprisal.

25    A.    Right.

1  for administrative leave.

2      A.   Right.

3      Q.   Okay.  That's Exhibit-3.

4      A.   Okay.  I'm sorry.

5      Q.   Now, you were requesting administrative

6  leave because your house was destroyed by a tornado,

7  is that correct?

8      A.   Yes.

9      Q.   When did that happen?

10     A.   In general, I asked for administrative

11 leave, like, almost immediately.

12     Q.   I mean, when did the tornado happen?

13     A.   Oh, the tornado, I believe it was the 28th

14 of April.

15     Q.   Okay.

16     A.   28th, 23rd or something like, it was the end

17 of April.  Last Sunday in April, I think.  Yeah.

18     Q.   Okay.

19     A.   Yeah, 20, yeah, 27 April is what it says

20 here.

21     Q.   All right.  Who did you make the request to

22 initially?

23     A.   All I had was text contact.  So, I texted

24 Neil, well, Mr. Neil.  He was my, he was the director

25 or the program manager that they hired to take over

1    A.    But ...

2    Q.    All right.

3    A.    ...: that as their initial answer.

4    Q.    All right.  So, you, did you use

5  approximately three weeks of your own accrued annual

6  leave?

7    A.    I don't know.  I think so, but I don't know.

8    Q.    Okay.  Did you lose any pay?

9    A.    I don't know.  I'd have to go back and look

10  at my, my leave and earning statements.  I don't know

11  if I lost anything or not.

12    Q.    For example, you were, you know, used up, if

13  you had used up all of your accrued leave, you

14  could've been put on leave without pay, which I guess

15  would mean you don't get paid.  Did that actually

16  happen?

17    A.    I don't remember.

18    Q.    Okay.

19    A.    I don't remember if I went through a, you

20  know, if it happened it would probably only for a pay

21  period, but anyway.

22    Q.    Okay.  So, when ...

23    A.    I don't know.

24    Q.    All right.

25    A.    I don't know that I went without any money.

```
 1        Q.    Okay.  Well, on June the 12th, you did get

 2   40 hours approved.  So, that would've taken care of up

 3   to four hours of any of your own accrued leave, is

 4   that correct?

 5        A.    Mm-hmm.  (Indicating affirmatively.)

 6        Q.    And if there had been any leave without pay,

 7   that would take care of that, wouldn't it?

 8        A.    Hmm.

 9        Q.    Sir?

10        A.    Yes.

11        Q.    Okay.  All right.  Now, on this document,

12   Defendant's Exhibit-3 on the first page, there's a

13   space to request advanced annual leave but you didn't

14   request that, advanced?

15        A.    I'm sorry.  Show me the ...

16        Q.    The first page of Defendant's Exhibit-3.

17   Paragraph number two.  Where it says, I, Jeffrey

18   Musselman request ...

19        A.    No, I was, I was asking, because the OPM reg

20   gives you, gave them authority to do this to give me

21   excused administrative leave, which meant I didn't

22   have to, if I'd gone for this other one, it would've

23   just been advanced leave and I would've had to, I

24   would've just burnt leave early.  So, that would not

25   have been a, I would not have been ...
```

1    Q.    Okay.  You didn't like that option?

2    A.    Didn't like that option at all, no.

3    Q.    Well, okay.  So, there is a difference then

4  I think in between advanced leave and administrative

5  leave.

6    A.    I'm sure those are used for other

7  circumstances, like, you know, you have a terminal

8  illness or ...

9    Q.    Okay.  Now, this Colonel Schueneman, at that

10  time, June of 2014.  He as not in your supervisory

11  chain, was he?

12    A.    Somewhere up, he was above Chesney.  He may

13  have been the deputy director at the time.  Matter of

14  fact, I think that's the reason why he's signing most

15  of this, but I'm not sure.  I mean, it says he's chief

16  of staff.  So, I don't know if he's subordinate to the

17  deputy commander in their chain.  If he was ...

18    Q.    Had you ever met Colonel Schueneman?

19    A.    Maybe on a video teleconference.  In person,

20  no.  Maybe on a video teleconference I saw him.

21    Q.    Okay.  Before, I'm talking about before June

22  the 14th, June of 2014.

23    A.    Not that I can recall.

24    Q.    Okay.  Did you ever have any dealings with

25  this Colonel Schueneman on any employment matter?

1  on the EEO taskforce or something.  If ever there was

2  an EEO incident, he and a couple of the other colonels

3  got notified ahead of time, so, anyway.

4      Q.    All right.  So, you're saying that Colonel

5  Schueneman was aware of the settlement of Ms. Jodie

6  Carr's EEO case, because of his position?  Is that

7  correct?

8      A.    Yes.

9      Q.    Okay.  How would he know that somewhere in

10 Ms. Carr's case you gave a statement?  How would he

11 know that?

12     A.    Because I was a witness in Ms. Carr's case.

13     Q.    Well, that's a detail of the case.  Have you

14 got any evidence, Mr. Musselman, that Colonel

15 Schueneman knew and was aware that you had given a

16 statement in Ms. Carr's EEO case?

17     A.    Other than examples like their ruling on

18 this leave and other incidents where they dealt

19 roughly or aggressively or whatever with me.

20     Q.    Okay.

21     A.    Just a feeling.  I'm not the only one that

22 got that feeling.

23     Q.    I understand that you believe that he knew.

24     A.    No, I'm not the only one that believed that.

25     Q.    But do you have any proof?



1      A.    Yeah.

2      Q.    **What?**

3      A.    Mr. Neil experienced the same feeling and he

4   testified to that in his hearing.  He said he didn't

5   know what was going on.  He hadn't been told

6   everything, but he knew that whenever my name was

7   mentioned, that everybody's hackles got raised.  I'm

8   paraphrasing that.

9      Q.    **I understand.  All right.  We talked about**

10  **the Jodie Carr case, the earlier EEO case of Mandy**

11  **Moore.  Do you have any evidence Colonel Schueneman**

12  **was aware of your participation in Mandy Moore's EEO**

13  **case?**

14      A.    This is the evidence that I have.  I

15  participated in those EEO events and at the end, in

16  2013, when Mr. Hubanks was basically forced to retire

17  or decided to retire and they started mentioning my

18  name as the replacement, everything was hunky dory.  I

19  even signed for several million dollars' worth of

20  equipment as the commander of that unit.  And then,

21  when it got down to the very end, making the

22  appointment, it didn't happen, so.

23      Q.    **Okay.**

24      A.    And I know that there were high-level, which

25  you would expect in any organization, conversations



1  about who's, who's taking over leadership positions

2  and who's, you know, fit for duty and who's not, so.

3    Q.   All right.  Are you aware of any Army rule

4  or regulation that would say that you were entitled to

5  the 120 hours of administrative leave?

6    A.   No, there's none.

7    Q.   Okay.  It is discretionary, is it not?

8    A.   It is discretionary.

9    Q.   Are you aware of any employee who asked for

10  initially and got 120 hours of administrative leave

11  because of some weather-related emergency?

12    A.   Other than what I've read in the newspaper,

13  no.  I don't know anybody personally that got that.

14  So, no.

15    Q.   Okay.  You can't say I know, I can identify

16  Mr. So-and-so got 120 hours?

17    A.   No.

18    Q.   You can't do that?

19    A.   Nope.

20    Q.   Okay.  All right.  Now, so, I think you

21  mentioned this earlier, I'm going to have you look at

22  Exhibit-4.

23  (WHEREUPON, the Deponent examined the document

24  previously marked Exhibit-4 for identification.)

25    A.   Sure.

1 they, they didn't want to do that.  They wanted to

2 have Mr. Talley ...

3      Q.    Well, if you know, when was he selected as

4 your first level supervisor?

5      A.    Well, he, Mr. Neil was hired because they

6 fired me and they had nobody else to put in to place.

7 So, they hired Mr. Neil off the street to be the

8 acting program manager.

9      Q.    Okay.

10      A.    And he took over in January of 2014, I

11 believe.  Because this had all happened in 2013.

12      Q.    Now, wait, you say you were fired, I mean,

13 you weren't fired from the time ...

14      A.    I was in charge and then I wasn't in charge.

15      Q.    Okay.  All right.  So, after Hubanks left,

16 you were temporarily in charge?

17      A.    Mm-hmm, for about two months.

18      Q.    Okay, and then you were ...

19      A.    While they worked on the paperwork for the

20 temporary promotion, because legally, I could not fill

21 that position unless I was temporarily promoted to

22 GS14, because of all of the legal things with

23 contracting and funds and so that's why I signed for

24 the equipment account and did inventories like I was

25 supposed to until they relieved me of my duty.

1      Q.    Okay.  All right.  That's as temporary

2   program manager?

3      A.    Mm-hmm.  (Indicating affirmatively.)

4      Q.    That's what you were, that's the duty ...

5      A.    Right.

6      Q.    ... you had.

7      A.    Yes.

8      Q.    You were relieved of it?

9      A.    Yes.

10      Q.    Okay.  All right.  Did, did someone

11   initially approve of your temporary promotion?  I

12   mean, you must have had somebody say it was okay.  Who

13   was that?

14      A.    Dalys Talley.

15      Q.    Okay.  Talley.

16      A.    Dalys Talley said that he was going to put

17   my name forward and he did the paperwork up and I

18   worked with the secretaries in the personnel office to

19   prepare whatever documents they needed for the

20   approval.  Just routing and approval, just like this

21   document that you showed that's a routing sheet.

22      Q.    All right.  So, Talley was overruled by

23   somebody?

24      A.    Somebody.

25      Q.    Okay.  All right.  Well, let's look at your

1  firm manner, demonstrates personal courage, mission

2  first, sets high standards.  So, anyway, it doesn't

3  really, it doesn't really, none of the things that I

4  got a satisfactory for were borne out with, with any

5  kind of explanation in the rating.

6      Q.    Okay.

7      A.    It's just arbitrary markings.

8      Q.    **Dalys Talley was stationed at the Aberdeen**

9  **Proving Ground, was he not?**

10     A.    Yes.

11     Q.    **And likewise, Christophor Chainey ...**

12     A.    Chesney.

13     Q.    **... his duty ...**

14     A.    Chesney.

15     Q.    **Chesney.  I'm sorry.  I don't know why I**

16  **keep saying ...**

17     A.    You're fine.

18     Q.    **Chesney, likewise, that was his duty station**

19  **was in Maryland, correct?**

20     A.    Yes.

21     Q.    **All right.  Now, the, was this your, Defense**

22  **Exhibit-5, this is an evaluation report.  Is that your**

23  **last evaluation before you ...?**

24     A.    No.

25     Q.    **All right.  What was the next one?**

1    A.    I got another one from the same, same

2  people.    This time it was Neil as the rater, because

3  he had, and Neil gave me a satisfactory and Chesney

4  took it away from him and gave me a failing.

5    Q.    **When was this?**

6    A.    A year later.

7    Q.    **2015?**

8    A.    Mm-hmm.    (Indicating affirmatively.)

9    Q.    **All right.**

10    A.    But the judge has already ruled against all

11  of this.

12    Q.    **Yeah, I think you started an MSB, an MSPB**

13  **complaint over that, didn't you, over that evaluation?**

14    A.    Originally, this started out as a merit

15  system protection complaint, as a whistleblower

16  complaint, because ...

17    Q.    **Oh, okay.**

18    A.    ... the, Mr. Hubanks was committing time

19  fraud in addition to the mishandling the sexual

20  harassment incident and he retaliated against me for

21  reporting it.

22    Q.    **All right.    Now ...**

23    A.    And so, I had a merit system protection or

24  merit system protection board case running and that

25  started in, in July of 2013.    This EEO complaint

```
 1  on the first day.  So, none of that could be tested.

 2  And then, then, I found out after I got back home that

 3  an email had been circulated amongst all the witnesses

 4  and the staff, our CARA staff, and the new program

 5  manager.  Basically, saying that they wanted to charge

 6  me with AWOL for attending this, well, for the time

 7  that I wasn't at the hearing.

 8       Q.   Well, let me ask you if you could do this

 9  for, for, if you can, you, describe to me each MSPB

10  case you've filed, take them one at a time.  Go from

11  first to the last.  Just briefly, when you, when you

12  filed it and what it was you were complaining about,

13  because I'm having a hard time ...

14       A.   Okay.

15       Q.   ... keeping them all straight.

16       A.   Okay.

17       Q.   To be honest with you.

18       A.   Right.  So, there was an initial MSPB

19  complaint filed.

20       Q.   All right.

21       A.   I filed with the northeast district because

22  my headquarters was in Maryland.

23       Q.   Okay.  That would be in 2013?

24       A.   That would be in 2013.

25       Q.   Okay.
```

1      A.    That would have been in July of 2013.

2      **Q.    All right.  And you were complaining about**

3   **...**

4      A.    Same stuff.

5      **Q.    Same.  You were complaining Mr. Hubanks ...**

6      A.    Retaliation.

7      **Q.    ... retaliated against you?**

8      A.    Denial of the temporary promotion and ...

9      **Q.    Okay, and what was the, was there a decision**

10   **on that particular case?**

11      A.    Again, this stuff is all just like the EEO.

12   It didn't just happen.

13      **Q.    Okay.**

14      A.    So, I filed it in 2013.  They moved it to

15   Dallas, under the Dallas MSPB headquarters.  So, same

16   case, it's just you'll see it listed differently.

17   Okay.  So, then, Dallas MSPB took over and then, the

18   case was dismissed without prejudice, because the EEO

19   or the Office of Special Counsel had not had a whack

20   at it.  So, I filed with the Office of Special

21   Counsel.

22            Office of Special Counsel looked at it for

23   six months and then wrote me a letter saying that I

24   could file my appeal with the MSPB.  So, I filed that

25   appeal with MSPB and I'll give you a list of these

1    Q.    Mr. Musselman, from June of 2014 when you

2  got the evaluation in question in your lawsuit, all

3  the way up to the present, is there any specific job

4  that you claim you lost because of that evaluation?

5    A.    No.

6    Q.    Okay.  All right.  Well, Mr. Musselman, I

7  don't have any more questions ...

8    A.    Okay.

9    Q.    ... for you.  I appreciate your attendance

10 and your answering my questions today, your patience.

11 So, thank you.  Thank you very much.

12   A.    Yes.  Thank you.

13        COURT REPORTER: Before we go off the

14 record, I just want to let Mr. Musselman know that you

15 have the right to review the deposition transcript for

16 its accuracy.  You can review it or you can waive that

17 right.  Which one do you prefer?

18        DEPONENT: I'll waive it.

19        COURT REPORTER: You'll waive it?  Okay.

20 And then, as far as transcript orders, Mr. Pence,

21 would you like a copy of the transcript?

22        MR. PENCE: Yes.

23        COURT REPORTER: And Mr. Deeds, would

24 you like a copy of the transcript?

25        MR. DEEDS: Oh, no, that's okay.

```
 1                            CAPTION

 2

 3   The deposition of JEFFREY SCOTT MUSSELMAN, taken in

 4   the matter, on the date, and at the time and place

 5   set out on the title page hereof.

 6

 7   It was requested that the deposition be taken by the

 8   reporter and that the same be reduced to typewritten

 9   form.

10

11   It was agreed by and between counsel and the parties

12   that the reading and signing of the transcript by the

13   deponent is hereby waived.

14

15

16

17

18

19

20

21

22

23

24

25
```

County
**COURT REPORTERS**, Inc.
Videography   Litigation Technology™

800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

1        **CERTIFICATE OF REPORTER AND SECURE ENCRYPTED**

2       **SIGNATURE AND DELIVERY OF CERTIFIED TRANSCRIPT**

3          I, **Latrice Evette Porter**, Notary Public, do

4    hereby certify that the foregoing matter was reported by

5    stenographic and/or mechanical means, that same was

6    reduced to written form, that the transcript prepared

7    by me or under my direction, is a true and accurate

8    record of same to the best of my knowledge and ability;

9    that there is no relation nor employment by any attorney

10   or counsel employed by the parties hereto, nor financial

11   or otherwise interest in the action filed or its outcome.

12       This transcript and certificate have been digitally

13   signed and securely delivered through our encryption

14   server.

15       IN WITNESS HEREOF, I have here unto set my

16   hand this 6TH day of DECEMBER, 2023.

17

18

19   COUNTY COURT REPORTERS, Inc.
VIDEOGRAPHY   LITIGATION TECHNOLOGY

20   SERVING THE LEGAL PROFESSION SINCE 1974

       LATRICE EVETTE PORTER, CTR

21   PROUD PARENT OF A U. S. MARINE
TECHNOLOGY REPORTER AND INFORMATION MANAGER
Reporter@VeteranReporters.com    **Latrice Evette Porter**

       800.262.8777 / 855.667.0077

22   WWW.COUNTYCOURTREPORTERS.com   Court Reporter / Notary

23        Notary Registration Number:  131887662

          My Commission Expires:  02/08/2027

24

25